UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

JOHN NICHOLS,                      )
                                   )
            Plaintiff,             )    CIVIL ACTION NO.
                                   )    10-11641-DPW
v.                                 )
                                   )
MICHAEL J. ASTRUE,                 )
Commissioner of Social             )
Security,                          )
                                   )
            Defendant.             )
                                   )

MEMORANDUM AND ORDER
February 13, 2012

    John Nichols appeals the final decision of the Commissioner
of the Social Security Administration (the "Commissioner"),
denying him Social Security Disability Insurance benefits
("SSDI") and Supplemental Security Income benefits ("SSI").  The
Commissioner has moved for an order affirming his decision, and
Nichols has moved for an order reversing the Commissioner's
decision.  After consideration of the entire record, which I find
provides substantial evidence for the denial, I affirm the
Commissioner's decision.

## I.  BACKGROUND

### A.  Basic Facts

    Nichols was forty-eight years old when he claims he became
disabled.  AR 181.  He reports he completed grade 12, but a

psychologist reported Nichols dropped out after grade 10.[1]  He

has previously worked as a dish washer and food preparer on a

yacht, a cashier, a baker, and a gas-station attendant.  AR 198.

Nichols became homeless starting in approximately 2005.  AR 238.

He has an extensive history of substance abuse.  *See, e.g.*, AR

79.  He also claims that as a child, he was physically and

sexually abused by his uncle over approximately two years.  AR

239.

B.  <u>Medical History</u>

    1.  *Physical Impairments*

        I.  Background Facts

    Nichols's medical history is replete with complaints of

chronic knee pain and leg swelling presented to doctors.[2]  AR

---

[1]  The record contains numerous such inconsistencies.  For
example, in January 2008, Nichols reported to Dr. Hurd that he
had one brother and one sister, and that his brother died in 2000
from cancer.  AR 239.  In August and October 2008, however,
Nichols reported that he was an only child.  AR 251 (report of
Nurse Russell), 282 (report of Social Worker Bellow).  By March
of 2009, Nichols claimed that he had a brother, but that the
brother had died of complications from AIDS in the 1980s.  AR
338.  In August 2008, although he had seen multiple doctors in
the intervening period, repeatedly confessed alcohol abuse, and
claimed to be homeless, Nichols reported he hadn't seen a doctor
in 15 years, denied any alcohol abuse, and claimed to live at
home alone.  AR 291.  These are but a few of the considerable
inconsistencies in the record; consequently, developing a clear
picture of Nichols's true ailments is a challenging undertaking.

[2]  Interestingly, Nichols seems to feel physical pain in two
different locations, depending on which type of treatment
provider he sees.  When seeing psychologists or social workers,
for example, Nichols predominantly complains of back pain, while
knee pain seems to dominate in the emergency room and with his

261, 418.  However, x-rays and an MRI showed only mild knee joint and cartilage degeneration.  AR 246 (x-ray), 419 (physician interpretation of x-ray showing mild degenerative joint disease, no evidence of laxity or ligament damage), 456 (physician interpretation MRI showing cartilage loss and thinning).  Nichols also complained of lower leg swelling.  AR 589.  Radiology revealed bone marrow edema consistent with mild to moderate degenerative joint disease.  AR 456.

Dr. Klausner, Nichols's primary care physician, generally reported mild knee crepitus (cracking or popping sounds in the joint), but noted that Nichols had a full range of motion in his knee, AR 418, and found no evidence of laxity or ligament damage. AR 419.

The record contains numerous conflicting reports of the extent of Nichols's impairments.  In January 2008, Dr. Hurd observed that Nichols walked with a limping gait.  AR 240.  On August 21, 2008, Nichols went to the Boston Medical Center emergency room complaining of back pain.  AR 295.  The reporting nurse noted that his gait was steady and that he did not have a

primary care physician.  *Compare, e.g.*, AR 282 (complaining of back pain to social worker at visit on August 29, 2008) *and* AR 265 (complaining of back pain to registered nurse in behavioral health unit during visit on November 14, 2008), *with* AR 277 (complaining of knee pain to physician during visit on the same day as the social worker visit, August 29, 2008) *and* AR 261 (presenting to emergency room for left knee pain on the same day as the visit with the nurse in the behavioral health unit, November 14, 2008).

limp.  AR 297.  While there, he had images taken of his spine.
AR 293.  The physician reviewing the images found no fracture and
that his alignment was within normal limits, but that he had a
slight narrowing of the L5-S1 intervertebral space.  AR 293.
When Nichols was refused a prescription for Percocet, he
discharged himself, crumpled the prescription form and threw it
away, then walked out "with fluid movement and gait."  AR 297.

On August 22, 2008, Nichols went to the urgent care clinic
at Boston Medical Center complaining of lower back pain.  AR 290.
He complained that ambulation caused pain, but that he was able
to walk.  AR 290.  However, the reporting physician noted that
when he denied Nichols a prescription for narcotics (because the
pharmacy had called and warned the physician that a patient of
the same name and date of birth had received multiple
prescriptions for narcotics over the past few months), Nichols
"became very angry, threatened to lodge complaints to
administration, and cussed myself and staff."  AR 291.  Nichols
then walked from the room "with fluid gait without difficulty."
AR 291.

On August 29, 2008, Nichols had images taken of his knees.
The doctor reviewing the images found mild degenerative changes,
including mild peaking of the tibial spines and mild marginal
osteophytes but no significant effusion or osteoblastic or lytic
lesions.  AR 279.

4

On November 14, 2008, Nichols went to the emergency room complaining of persistent left knee pain and swelling.  AR 261. Upon evaluation, however, doctors were unable to find anything wrong.  There was no swelling in the knee, no tenderness to palpation, Nichols had full range of motion in the knee, and all tests were negative.  AR 262.  His gait appeared normal, and he was able to bear weight on his knee without a limp.  AR 262.

On February 25, 2009, Nichols presented to the emergency room with complaints of right leg pain and lower back pain.  AR 346.  The reporting physician did not observe any signs of trauma or spinal tenderness, and noted that Nichols had been in the emergency room multiple times seeking pain medication.  AR 348. Instead of giving him a prescription for narcotics, the physician gave him a single Tylenol.  AR 348.

On March 1, 2009, Nichols presented to the emergency room with symptoms of salicylate (a painkiller agent) overdose.  AR 340.  Nichols had taken two 325mg aspirin and three Motrin, and was disoriented, aggressive, and combative.  AR 343.  After treatment, he was unable to ambulate well and was returned to a shelter.  AR 344.  On March 11, 2009, Nichols returned to the emergency room complaining of weakness and a concern that he had a seizure.  AR 333.  After observation, Nichols left, but returned on March 12 complaining of bilateral swelling in his

legs.  AR 327.  The nurse reported that his gait was normal after examination.  AR 328.

On March 21, 2009, Nichols returned to the emergency room complaining of back pain after a fall from a step ladder.  The doctor noted that Nichols had a normal gait, but prescribed him Percocet for the pain.  AR 325.  Over the next two weeks, Nichols reported to the emergency room numerous times complaining of chest pains and nausea, but doctors did not find anything of concern.  AR 310, 314, 317.

On April 3, 2009, Nichols had another MRI done of his left knee.  AR 605.  The physician viewing the MRI results noted that all ligaments were intact and everything was normal except for some "thinning of the lateral patellar cartilage with a corresponding denudation of the cartilage on the lateral femoral condyle," the same thinning that had been found in the earlier MRI taken of Nichols's knee.  AR 605.  There was also the associated "mild subjacent bone marrow edema within both bones." AR 605.

In April, Nichols began going to the McInnis Health Group with complaints of left knee pain (as well as anxiety, discussed below).  Observers regularly noted that his gait was normal and he did not appear to be in acute distress.  *See, e.g.*, AR 464. By April 20, 2009, he was still complaining of back and knee pain, but otherwise had no complaints.  AR 490.  When a lidocaine

patch was applied, however, Nichols stated he felt pretty good. AR 504, 507.  With a further adjustment and the addition of Flexeril in late April, Nichols reported feeling "much better" with "little pain."  AR 515.

Once released from treatment by the McInnis Health Group, however, Nichols frequently returned to the emergency room, complaining of leg swelling and various other ailments.  On July 12, 2009, for example, Nichols went to the emergency room complaining of swelling in both legs.  AR 589.  When he was told he would need further evaluation before he could be given a prescription for morphine, he "became very agitated and refused further [evaluation]."  AR 591.

In September 2009, Nichols saw his primary care physician Dr. Klausner on numerous occasions.  AR 806.  Dr. Klausner noted that Nichols had been to the emergency room fifteen times in the past twenty-three days, and that he "has been using knee pain as complaint to get narcotics."  AR 807.  Nichols was drinking approximately a pint of vodka per day and abusing Percocet, oxycodone, and Tylenol #3 which he had been getting from emergency rooms in the "context of knee pain."  AR 817.

ii.  Expert Physical Assessments

In April 2009, Dr. Hom completed a physical residual functional capacity exam ("RFC") for the Social Security Agency. AR 408-415.  She concluded that Nichols could lift up to fifty

pounds occasionally and twenty-five pounds frequently, could sit, stand, and/or walk six hours in an eight-hour workday, had an unlimited ability to push and pull, but should avoid exposure to pulmonary irritants.  AR 408-415.

In July, Dr. Connelly completed an additional physical RFC for the Social Security Agency.  AR 644-651.  She opined that Nichols could lift up to twenty pounds occasionally and up to ten pounds frequently and could sit, stand, and/or walk for six hours in each eight-hour workday.  She also thought that Nichols had a limited ability to push and pull with his legs, that he could occasionally climb, balance, stoop, kneel, crouch, and crawl, but that he should avoid pulmonary irritants.  TR. 644-651.

In January 2010, Nichols's primary care physician, Dr. Klausner, completed a medical source statement regarding Nichols's physical capabilities.  AR 1172-1175.  Dr. Klausner noted that Nichols had suffered hand trauma in October 2009, and was therefore uncertain whether Nichols's ability to lift, carry, and manipulate had been diminished.  AR 1172, 1174.  Dr. Klausner opined that Nichols could stand and/or walk at least two hours and sit about six hours in an eight-hour workday, and could occasionally climb, balance, and stoop, but never kneel, crouch, or crawl.  AR 1172-73.  Dr. Klausner also noted that Nichols "consistently walks [with] difficulty in the clinic."  AR 1173.

  *2.  Mental Impairments*

     I.   Background Facts

On January 23, 2008, Nichols was seen by Dr. Hurd, a
consulting psychologist.  AR 238.  Dr. Hurd noted that Nichols's
mood was moderately depressed, but was steady with appropriate
affect.  AR 239.  Out of a possible 30 points on the mini mental
status exam, Nichols got a perfect score, and Dr. Hurd thought
that Nichols was capable of abstract thought, with full insight
and judgment and average memory and intellectual functioning.  AR
240.  Dr. Hurd diagnosed Nichols with recurrent depression.  AR
240.

On August 29, 2008, Nichols complained of depression to a
social worker with Boston Medical Center's Behavioral Health
Services unit.  AR 281.  The social worker ordered a
psychotherapy evaluation for Nichols.  AR 284.

On October 14, 2008, Nichols complained of anxiety, and was
started on a combination of Benadryl and Celexa.  AR 250-51.  He
returned shortly, complaining that it was not working.

On January 15, 2009, Nichols's case manager reported that
Nichols was inactive, distressed, anxious, suspicious of others,
isolated, disoriented, withdrawn, and confused.  AR 302.  She
also reported that he scored "less than adequate" or "poor" in
concentration, persistence, cooperation, judgment, memory,

reliability, social interactions, interactions with authority, follows simple instructions, and follows program rules.  AR 301.

In April 2009, Nichols again complained of anxiety.  *See, e.g.*, AR 454.  He was prescribed Seroquel, and shortly thereafter he stated that his anxiety was better.  AR 454.  By April 14, 2009, doctors reported that he was tolerating Seroquel "with excellent control of anxiety symptoms."  AR 471.

ii.  Expert Mental Assessments

On April 13, 2009, Dr. Langer performed a mental RFC assessment for the Social Security Agency.  AR 404-07.  Dr. Langer found that Nichols was moderately limited in his ability to understand and remember detailed instructions, his ability to carry out detailed instructions, and his ability to maintain attention and concentration for extended periods.  AR 404.  Dr. Langer also found that Nichols was moderately limited in his ability to interact appropriately with the general public and in his ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods.  AR 405.  In all other respects, Dr. Langer found Nichols "not significantly limited."  AR 404-05.  Dr. Langer opined that Nichols would be able to understand and remember simple instructions, be socially appropriate, and will be able to

concentrate and maintain attention for at least a two-hour time period.  AR 406.

On July 23, 2009, Dr. Harris performed an additional mental RFC assessment for the Social Security Agency.  AR 640-43.  Dr. Harris thought that Nichols was moderately limited in his ability to maintain attention and concentration for extended periods, accept instructions and respond appropriately to criticism from supervisors, and complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods.  AR 640-41.  Dr. Harris found no evidence that Nichols was limited in his ability to understand and remember detailed instructions, and in all other respects found Nichols was not significantly limited.  AR 640-41.  Dr. Harris opined that Nichols would be able to maintain focus, pace, and persistence for simple tasks for two-hour periods within a normal work schedule.  AR 642.

C.  Procedural History

    1.  *Application for SSDI and SSI*

Nichols filed his claim for SSDI and SSI on November 17, 2008.  He claimed that he became disabled on July 1, 2008 due to

"[s]evere depression/anxiety, rheumatoid arthritis, [and] bipolar."  At the time, he was insured.[3]

The claim was denied in April, 2009.  Nichols sought reconsideration and the claim was again denied on August 6, 2009. Nichols then filed a request for a hearing before an ALJ.

   2.   *The ALJ's Hearing*

On February 11, 2010, the ALJ held a hearing at which Nichols, a medical expert, and a vocational expert testified.

      I.   Nichols

Nichols testified that he last worked as a full-time gas-station attendant.  Nichols became homeless when his landlord sold the house Nichols was renting a room in, and the new owners demanded more in rent than Nichols could pay.  When Nichols told the gas-station owner that he was going to have to live in a shelter, the gas-station owner fired him because he didn't want Nichols to have the hassle of coming to work every day from the shelter.  Though he looked for more work as a gas-station attendant, Nichols was unable to find any.

When asked why he couldn't work, Nichols responded that he can only walk one-to-two blocks at a time before his knee swells

---

[3]  To be eligible for SSDI, Nichols must show that he was insured for disability at the time he became disabled.  Under the regulations, he must show that he was fully insured and had "at least 20 [quarters of coverage] in the 40-quarter period" leading up to the quarter in which he became disabled.  20 C.F.R. § 404.130(b).

up and hurts.  He testified that he could stand for approximately an hour but then would have to sit down.  He also said that he could not stay seated for long because he would get fidgety and nervous.  Nichols admitted that he did not have any physical problems with sitting.

Nichols testified that he had recently been hit by a snowplow, injuring his hand, but that the injury was only temporary and was therefore not the basis of his claim.  Nichols then detailed how his fingertips occasionally went numb, though he was able to count money and do other tasks at his previous gas-station job with the problem.  He said he was experiencing chronic obstructive pulmonary disease ("COPD") but was still smoking cigarettes, though he was trying to quit.  Nichols confirmed that the only physical ailments he was claiming as disabling were his knee pain, the COPD, and the numbness in his fingertips.

Nichols then detailed his psychiatric problems for the ALJ. First, he noted he has severe depression, and that his medications were making him suicidal so he stopped taking them. He had not seen a medical professional for his psychiatric problems in five or six months because he had been given some breathing exercises that helped him a lot and he didn't feel the need to get more help.

Nichols then discussed his problems with substance abuse. He admitted to having abuse problems with beer and Percocet, and that he would regularly go to the emergency room to get prescriptions for Percocet.  Nichols testified that he had gone to detox for his alcohol addiction and had been clean for six months.  He admitted to having used Percocet since the 80s, but that it did not affect his ability to hold a job during that time.

The ALJ then inquired about Nichols's daily routine. Nichols stated that he would go to McDonalds for coffee every morning.  Afterwards, he would return to the shelter and watch TV or lay down until dinner.  He also testified that he walked the two-and-a-half to three miles to that day's hearing with the ALJ, but that his knees were sore as a result.

ii.  Medical Expert

Dr. Gitlow, a psychiatrist, also testified.  Dr. Gitlow stated that after reviewing all of the records and listening to Nichols's testimony at the hearing, he concluded Nichols had a significant history of substance use.  Dr. Gitlow testified that Nichols had used pain medications since the 1980s with no clear period of sobriety evident when considering the numerous inconsistencies in his reported substance abuse history to various doctors.

14

As to the mental status examinations in the record, Dr. Gitlow noted that there was no evidence of any mental impairment, whether or not Nichols was abusing alcohol and drugs at the time of the reports.  Dr. Gitlow noted that there were no mental status exams that indicated difficulty with concentration, persistence, or pace.  When asked whether he thought Nichols's psychological problems would get better if Nichols stopped using drugs or alcohol, Dr. Gitlow opined that he didn't think there would be much improvement because Nichols did not appear to be "particularly impaired from a psychiatric standpoint, even with the drugs and alcohol."

When asked what non-functional limitations Nichols had with respect to his psychiatric problems, Dr. Gitlow suggested that Nichols "would probably have difficulty working around large groups of people where there's expectation of productivity among those people."  Dr. Gitlow suggested that Nichols might work better in a "quiet environment where there's no pressure from other people who are right next to" him.

### iii. Vocational Expert

The ALJ then posed a hypothetical to the vocational expert ("VE"), Ruth Baruch.  The ALJ's hypothetical contained all of Nichols's RFC limitations that the ALJ ultimately found.  The VE testified that with those restrictions, the hypothetical individual could perform hand collator work (DOT 977.687-010),

electronic work (DOT 726.687-010), and mail sorting (DOT 209.687-026).  The VE testified that in Massachusetts there are 8,800 jobs in the census group for hand collator work, and 472,900 in the United States.  The VE testified that in the census group for electronic work, there were 2,140 jobs in Massachusetts and 280,160 in the United States.  Finally, the VE testified that in the census group for mail sorters, there were 4,661 jobs in Massachusetts, and 137,350 in the United States.

The numbers the VE gave were drawn from census groups, which each encompass a number of DOT jobs.  The census group for the mail sorter job encompassed four DOT jobs, the census group for the hand collator job covered 781 DOT jobs, and the census group for the electronics worker job was an umbrella grouping of 1,507 DOT jobs.  The VE noted that no better published data exists which details the incidence of individual DOT jobs, and that she was basing her estimation on the best information she had.

When the hypothetical was limited to two hours of standing and/or walking, the VE testified that the hypothetical individual could still perform the jobs identified, though the hypothetical individual might be excluded from a certain number of them.  The VE estimated based on her 20 years of experience that there would be a forty-percent reduction in the number of mail sorter positions available, and a twenty-five to thirty-percent reduction in the number of collator positions available.

After the VE finished testifying, Nichols objected that the VE's data was insufficient to meet the Commissioner's burden of proving that substantial numbers of jobs the claimant is capable of performing exist in the national economy.

3.   *The ALJ's Decision*

After finding that Nichols was eligible for SSDI benefits because he had been insured at the time of the alleged disability, the ALJ concluded that Nichols was not disabled within the meaning of the Act.  To reach this conclusion, the ALJ undertook the requisite five-step sequential analysis.

At step one, the ALJ found that Nichols had not engaged in substantial gainful activity since July 1, 2008.  At step two, the ALJ found that Nichols suffered from mild to moderate degenerative joint disease in his knees, and poly-substance abuse.  The ALJ classified these impairments as "severe" under the Act because they caused Nichols more than minimal functional limitations.  However, the ALJ found that Nichols's COPD and seizure disorder were not severe because they did not have any associated complained-of functional limitations.

At step three, the ALJ found that Nichols did not have an impairment or combination of impairments that met or was equivalent to one of the listed impairments in the regulations. The ALJ found that the record failed to establish that Nichols's bilateral degenerative joint disease limited his ability to

ambulate effectively as defined in the regulations.  The ALJ also
found that because Nichols's mental impairments did not cause at
least two "marked" limitations or one "marked" limitation and
"repeated" episodes of decompensation as defined in the
regulations, the impairments were not medically equivalent to
those listed in the regulations.

At step four, the ALJ found that Nichols had the RFC to
perform light work with the following limitations: sit for six
hours over an eight-hour workday; stand and/or walk for six hours
over an eight-hour workday; lift and/or carry twenty pounds
occasionally and ten pounds frequently; occasionally climb
stairs, ramps, ropes, ladders, and scaffolds; occasionally
balance, stoop, crouch, kneel, and crawl; avoid moderate exposure
to fumes, odors, gases, and other pulmonary irritants; and
Nichols "cannot be in or around large groups of people and is
limited to work in a singular or quiet environment."  The ALJ
found that these limitations would prevent Nichols from
performing his past relevant work.

The ALJ then found, at step five, that there are jobs that
exist in significant numbers in the national economy that Nichols
could perform.  In making this determination, the ALJ evaluated
Nichols's age, RFC, education, work experience, and the testimony
of the VE.  Because the VE's testimony established that there
were a substantial number of jobs in the national economy that

Nichols could perform, the ALJ found that Nichols was not disabled.

## II. STATUTORY FRAMEWORK

### A. Standard of Review of an ALJ's Decision

The Social Security Act authorizes judicial review of social security disability determinations. 42 U.S.C. § 405(g). A reviewing court is authorized to "enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." *Id.*

The factual findings of the Commissioner must be treated as conclusive if "supported by substantial evidence." *Id.* Review is "limited to determining whether the ALJ used the proper legal standards and found facts based on the proper quantum of evidence." *Ward v. Comm'r of Soc. Sec.*, 211 F.3d 652, 655 (1st Cir. 2000). "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). Evidence is not insufficient under this standard merely because contradictory evidence exists in the record. *Doyle v. Paul Revere Life Ins. Co.*, 144 F.3d 181, 184 (1st Cir. 1998).

### B. Standard for Entitlement to SSDI and SSI Benefits

The underlying issue before me is whether Nichols is "disabled" for purposes of the Social Security Act and is

19

therefore eligible for SSDI and SSI benefits.  A "disability" is
defined by the Act as an inability "to engage in any substantial
gainful activity by reason of any medically determinable physical
or mental impairment which can be expected to result in death or
which has lasted or can be expected to last for a continuous
period" of at least twelve months.  42 U.S.C. § 423(d)(2)(A)
(defining disability for SSDI); 42 U.S.C. § 1381c(a)(3)(A)
(defining disability for SSI).

An individual may only be considered disabled for purposes
of receiving benefits if his impairment is "of such severity that
he is not only unable to do his previous work but cannot,
considering his age, education, and work experience, engage in
any other kind of substantial gainful work which exists in the
national economy."  42 U.S.C. §§ 423(d)(2)(A) (SSDI); 42 U.S.C. §
1381c (a)(3)(B) (SSI).

Under the relevant regulations, the Commissioner evaluates
an individual's claim of disability under a five-step analysis.
20 C.F.R. §§ 404.1520(a), 416.920(a).  If the Commissioner
determines that the claimant fails any of the five steps, he can
find that the claimant is not disabled under the Act and need not
continue the sequential analysis.  *Id.* §§ 404.1520(a)(4),
416.920(a)(4).

At the first step, a claimant is not considered disabled if
he is engaged in "substantial gainful activity."  *Id.*

At the second step, if the claimant does "not have a severe medically determinable physical or mental impairment that meets the duration requirement . . . or a combination of impairments that [are] severe and meets the duration requirement" the individual is not considered disabled.  *Id.*

At the third step, if a claimant's impairment meets or is equivalent to one specifically listed in the regulations and meets the duration requirement, the individual is deemed disabled.  *Id.*

At the fourth step, the claimant's residual functional capacity is determined, and if, given this determination, the claimant is capable of performing his or her past relevant work, he is not considered disabled.  *Id.*

The fifth step considers the claimant's residual functional capacity ("RFC") as well as age, education, and work experience to determine whether the claimant can make an adjustment to other work.  If an adjustment can be made, the claimant is not considered disabled.  *Id.*

If at step four the claimant shows that he is unable to perform past relevant work, then at step five, in order to find the claimant not disabled, the Commissioner must come forward with evidence of the existence of specific jobs in the national economy that the claimant would be able to perform.  *See Seavey v. Barnhart*, 276 F.3d 1, 5 (1st Cir. 2001).

### III.   DISCUSSION

Nichols claims that the Commissioner made two errors in evaluating his claim, and therefore the denial of SSDI and SSI should be reversed or remanded for further consideration.  First, he claims that the ALJ erred by giving insufficient weight to Dr. Klausner's treating source statement.  Second, Nichols claims that at step five, the Commissioner erred in finding that there are a substantial number of jobs that exist in the national economy that Nichols could perform.  Each claim will be addressed in turn.

### A.   Insufficient Weight to Dr. Klausner

First, Nichols claims that the ALJ gave insufficient weight to Dr. Klausner's treating source statement.  The ALJ declined to give Dr. Klausner's opinion controlling weight under the regulations pursuant to SSR 96-5p because it was "incomplete" and "inconsistent with the bulk of the objective medical evidence of record."

Under First Circuit law, the ALJ was not required to give greater weight to the opinion of Dr. Klausner simply because he was Nichols's treating physician.  *Arroyo v. Sec'y of Health & Human Servs.*, 932 F.2d 82, 89 (1st Cir. 1991) (per curiam). Indeed, the Social Security Administration has ruled that to do so is error if the treating source's opinion "is not well-supported by medically acceptable clinical and laboratory

techniques or if it is inconsistent with the other substantial
evidence in the case record." Soc. Sec. Ruling 96-2p.

When an ALJ decides not to give a treating physician's
opinion controlling weight because it is inconsistent with other
substantial evidence in the record, the ALJ must nevertheless
weigh the opinion based on a number of factors listed in the
regulations.  20 C.F.R. § 404.1527(d).  Those factors include (1)
the length of the treatment relationship and the frequency of
examination; (2) the nature and extent of the treatment
relationship; (3) the medical evidence supporting the opinion;
(4) the opinion's consistency with the record as a whole; (5) the
physician's specialization in the medical conditions at issue;
and (6) other factors which tend to support or contradict the
opinion. 20 C.F.R § 404.1527(d).  Generally speaking, a treating
physician's opinion will be entitled to more weight than a
consulting physician's opinion.  *See* 20 C.F.R. § 404.1527(d)(2).

Dr. Klausner's opinion conflicted with the record in a
number of significant ways.  First, Dr. Klausner opined that
Nichols could stand and/or walk for at least two hours in an
eight-hour workday due to "chronic knee pain."  AR 1172-73.
However, in the very next sentence of his opinion, he notes that
Nichols's degenerative joint disease was "mild," AR 1173, and in
a number of reports in September of 2009 noted that Nichols was
using complaints about knee pain to procure drugs from emergency

23

rooms. *See, e.g.*, AR 807, 817.  An ALJ is entitled to view such drug-seeking behavior as undermining a claimant's complaints of pain. *See Costa v. Astrue*, 2011 WL 1155263, at *11 (D. Mass. March 25, 2011) (finding that an ALJ's determination that a plaintiff's back pain was not as severe as alleged was supported by substantial evidence in the record when the record contained "ample evidence of the plaintiff's drug-seeking and dishonest behavior").

Furthermore, Nichols testified that he walked to meet friends for coffee every morning, and walked almost three miles to the ALJ hearing. AR 61, 72-73.  Although Dr. Klausner noted that Nichols consistently walked with difficulty in his clinic, AR 1173, nearly every other medical report that mentions the matter notes that Nichols has a normal gait, no limp, full range of motion, and walks fluidly.  *See, e.g.*, AR 262 (finding no defects or damage in the knee and noting that Nichols is able to bear weight on his leg), 291 (noting Nichols walked with a fluid gait without difficulty after being denied narcotics for alleged back pain), 297 (noting a steady gait, no limp, and fluid movement after being denied Percocet), 325 (noting a normal gait), 418-19 (Dr. Klausner's own notes finding full range of

motion).  *But see* AR 240 (January 2008 notes from Dr. Hurd

observing a limping gait[4]).

Dr. Klausner's opinion also conflicted with both Dr. Hom's

and Dr. Connelly's opinions.  Dr. Hom and Dr. Connelly both

concluded that Nichols was capable of standing and/or walking for

six hours out of an eight-hour workday.  AR 408-415, 644-651.

The ALJ is entitled to choose between medical experts when a

treating physician's opinion is not entitled to controlling

weight because it conflicts with substantial evidence.  *Cf.*

*Keating v. Sec'y of Health & Human Servs.*, 848 F.2d 271, 275 n.1

(1st Cir. 1988) (per curiam) ("It is within the [Commissioner's]

domain to give greater weight to the testimony and reports of

medical experts who are commissioned by the [Commissioner].").

Dr. Klausen's opinion that Nichols's concentration and

attention were significantly compromised by pain and/or

medications was also inconsistent with the record.  AR 1174.

First, as noted above, Nichols's drug-seeking behavior

significantly undermines his credibility with regards to pain.

Second, as Dr. Gitlow testified, none of the mental status

examinations in the record showed that Nichols had any difficulty

with concentration, consistency, or pace.  AR 81-82.  Finally,

Nichols himself admitted that though he had abused Percocet since

---

[4]  At his hearing, Nichols admitted to lying repeatedly to Dr.
Hurd in January 2008.  AR 66-68.

the 1980s, that abuse had not impacted his ability to work.  AR
70.

It was within the discretion of the ALJ to find that these
conflicts undermined Dr. Klausner's opinion, because it is the
ALJ's responsibility to resolve such conflicts in the evidence.
*See Ortiz v. Sec'y of Health & Human Servs.*, 955 F.2d 765, 769
(1st Cir. 1991) ("[T]he resolution of conflicts in the evidence
is for the [Commissioner], not the courts."); *Rodriguez v. Sec'y
of Health & Human Servs.*, 647 F.2d 218, (1st Cir. 1981)("[T]he
resolution of conflicts in the evidence and the determination of
the ultimate question of disability is for [the Commissioner],
not for the doctors or for the courts.").  The ALJ's decision to
reject Dr. Klausner's opinion, as conflicting with substantial
evidence in the record, was itself supported by substantial
evidence and was not error.[5]

B.   Error at Step Five

Second, Nichols claims that the Commissioner erred at step
five of the analysis in finding that there were a significant

---

[5]  Nichols also claims that the ALJ should have re-contacted Dr.
Klausen for a more complete opinion because the ALJ found the
evidence inadequate.  However, where the evidence as a whole
contains substantial evidence to support an ALJ's findings, he is
not required to re-contact a treating source.  *Cox v. Astrue*,
2009 WL 189958, at *7 (D. Mass. Jan. 16, 2009) ("When the medical
record resolves the claim . . . the ALJ is not obligated to
recontact the treating physician.").

number of jobs in the national economy that Nichols could
perform.

When performing step five of the sequential analysis, the
ALJ must determine whether a claimant can do other jobs available
in the national economy based on his residual functional
capacity, age, education, and work experience.  20 C.F.R. §
404.1520(a)(4).  The ALJ may use testimony from a VE to determine
the number of jobs available in the national and local economies
to a hypothetical claimant with the RFC restrictions the ALJ
finds.

Here, Nichols argues that the job numbers provided by the VE
were for census groups (that is, groups of DOT jobs), rather than
for specific DOT occupations, and therefore the Commissioner
erred.  This argument, apparently novel in the District of
Massachusetts,[6] relies on two cases from the District of Maine
which found that a VE's testimony was inadequate where "the
vocational expert . . . essentially admitted that he did in fact
rely on published raw numbers, which pertained not to the
specific DOT . . . jobs at issue but rather to *groups of jobs* of
differing skill and exertional levels that happened to contain
the three specific jobs." *St. Pierre v. Astrue*, 2010 WL 5465635,

[6]  Neither the parties nor this court have been able to find a
case in this district which presented Nichols's theory.  The
theory appears to have been developed by Nichols's counsel's
firm, who appeared for the plaintiffs in the only four cases in
the District of Maine that have addressed it.

27

at *3 (D. Me. Dec. 29, 2010) (citing *Clark v. Astrue*, 2010 WL 2924237, at *3 (D. Me. July 19, 2010)) (emphasis in original).

In *Clark*, the ALJ relied on the VE's testimony of the number of regional and national jobs available to find that the claimant was not disabled at step five. 2010 WL 2924237 at *3. The VE testified that there were more than 800 regional and 225,000 national mail clerk jobs, more than 750 regional and 185,000 national order caller jobs, and more than 800 regional and 130,000 national marker jobs. *Id.* at *2. When questioned, the VE admitted that the numbers he cited were groupings of DOT code-identified jobs, but that he did not know how many different DOT jobs were contained within each group. *Id.* Magistrate Judge Rich therefore found that the VE's testimony "cannot constitute substantial evidence that the three specific jobs at issue existed in significant numbers in the national economy." *Id.* at *3.

In *St. Pierre*, the VE did essentially the same thing as in *Clark*, and Magistrate Judge Rich again found that the VE's testimony could not constitute substantial evidence. 2010 WL 5465635, at *3. He noted that "as in *Clark*, the vocational expert simply relayed numbers keyed to . . . census codes without attempting to specify the percentage attributable to the specific DOT-coded jobs in question." *Id.* at n.3.

28

In two other cases, *Decker v. Astrue*, 2010 WL 4412142 (D. Me. Oct. 31, 2010), and *Woodard v. Astrue*, 2011 WL 2580641 (D. Me. June 28, 2011), however, Magistrate Judge Rich affirmed an ALJ's reliance on similar testimony from a VE.  In *Decker*, the VE allocated ten percent of the job numbers under a census group to the specific DOT code-identified jobs that he testified the claimant could perform.  2010 WL 4412142, at *2.  Magistrate Judge Rich distinguished *Decker* from *Clark* on the ground that the VE in *Decker* testified that he relied on his thirty years of experience and on market surveys to determine what he thought were "the best [numbers] . . . from using the resources [he had] available."  *Id.* at *3.

In *Woodard*, the VE testified that based on the hypothetical RFC provided by the ALJ, the hypothetical claimant could perform the jobs of charge account clerk, dowel inspector, and final assembler, each with between 53 and 189 jobs in Maine and 13,167 and 32,790 jobs nationally.  2011 WL 2580641, at *5.  The VE admitted that the numbers were based on census groups that contained numerous other DOT code-identified jobs with varying exertional and skill levels.  *Id.*  However, the ALJ there asked the VE "in terms of the numbers, and again they're granted the[y] are derived from the census data.  Based on your professional experience do those numbers sound realistic in terms of availability?"  The VE responded "Yes they do."  *Id.*  Magistrate

Judge Rich held that because the VE "relied on professional expertise in giving what she felt were realistic numbers for the jobs in question," *Woodard*, like *Decker*, could be distinguished from *Clark* and *St. Pierre*.  *Id.*

Here, the VE's testimony is more like that in *Woodard* and *Decker* than that in *Clark* and *St. Pierre*.  The VE in this case initially reduced the number of jobs from the national census groups by a percentage she estimated from her twenty years of experience would accurately reflect the reduction in jobs available to Nichols based on a limitation to two hours of standing/walking per eight-hour workday.  AR 90-91.  While the VE offered to break down the data using the Occupational Quarterly Reports, she testified that she did not find that source to be accurate.  AR 92.  Instead, she said that the numbers she had given were "the best information that's out there."  AR 92.  She then identified the number of DOT code-identified jobs contained within each of the census groups she had used to estimate the number of jobs available to Nichols in the national economy.  AR 93-95.

The VE here did more than the VEs in *Clark* and *St. Pierre*, who only cited the raw numbers with no further elucidation or statement of the accuracy of their estimates.  Unlike the VE in *Decker*, the VE in this case did not give an exact estimate of the percentage of the census-group-available jobs that could be

attributed to the appropriate DOT code-identified jobs that she opined Nichols could do.  However, she did say, as in *Woodard*, that the numbers she gave were the best information available.

Given that this case looks more like *Woodard*, and to some degree *Decker*, than *Clark* and *St. Pierre*, I find no occasion to reject the ALJ's step five determination as unsupported by substantial evidence.  Another magistrate judge in the District of Maine correctly observed that "[a] vocational expert's testimony must be based on estimates by its very nature.  The social security scheme does not contemplate that vocational experts will have the benefit of actual market surveys for each case in which they may testify." *Farrin v. Barnhart*, 2006 WL 549376, at *4 (D. Me. March 6, 2006).

Though we may wish that data broken down by DOT code-identified job existed, it does not.  Vocational experts and ALJs must do the best they can with the limited date available to them.  Here, that is what the vocational expert did, and the ALJ did not err to rely on the data she provided.

## IV.   CONCLUSION

For the reason set forth above, I AFFIRM the Commissioner's decision by granting the Commissioner's motion for affirmance (#17) and denying Nichols's motion for reversal (#15).

*/s/ Douglas P. Woodlock*
DOUGLAS P. WOODLOCK
UNITED STATES DISTRICT JUDGE